Thank you for waiting. The next case and the last case on our calendar this morning, Amazon.com v. Commissioner of Internal Revenue. When you're ready, Counsel. Good morning, and may it please the Court. Judith Hagley from the Department of Justice representing the Commissioner in this case. I'd like to reserve two minutes for rebuttal. Thank you. This case presents a problem that Congress and the Treasury Department have been working for decades to eliminate, and it's the problem of U.S. multinationals shifting profits overseas by grossly undervaluing intangibles made available to their foreign subsidiaries. In 1986, Congress amended Section 40 to address this problem, directed the Treasury Department to revise its regulations to address this problem, and emphasized in that history that when parties enter into a cost-sharing arrangement, if any head-start intangibles, sometimes called pre-existing intangibles, are made available to that cost-sharing arrangement, an arms-length payment would be required to be made before that cost-sharing arrangement would be respected for tax purposes. Well, let's just jump in. Before the 1994 regulations, the definition of intangible made no reference to residual business assets, such as workforce in place, goodwill, or going concern value. In 1993, Treasury requested public comment on whether the definition should be expanded to include such items. The definition in the final regulations, adopted a year later, was essentially the same as before, with the change to the language of the catch-all provision. In light of the drafting history of the rule, why should we interpret the 1994 definition as an expansion that includes, quote, unquote, residual business assets? Because, two reasons. The first is just the plain language itself of the definition of similar items. It's written so broadly to include any item that derives its value from anything other than physical attributes. That is broad enough to capture those items, items like growth options, and corporate culture, goodwill, going concern, all those which... It is. It is. It is very, very broad, but are you going to talk about Treasury Reg 1.482-4B? Yes. Okay. I mean, that's where the similar items is defined in Dash 4B-6. And you need to look at the history that preceded this. As far back as 1963, when the Treasury Department issued its first public guidance on the definition of intangibles for transfer pricing purposes. Treasury made clear that it included items that one did not normally think of as intellectual property. It wasn't just patents. It was broader than that. It included goodwill, consumer acceptance, market share. Things that couldn't be independently transferable. Things that were attached to the business itself. And this was the first guidance that was out there. Can you point me to anything specifically in the Treasury's explanation of the 1994 regulations that suggests it intended the definition of intangible to be expanded to include residual business assets? Can you point me anywhere specifically? Well, they used the word clarified. And the reason why they were... I mean, the interpretation of the definition of intangibles had always been broad. And, you know, I mentioned 63, Revenue Procedure 6310. We have the 1984 amendment to Section 367 for Congress. Revenue Procedure recognized in the legislative history that the definition of intangibles included items like goodwill, going concern value, directed the Treasury Department to create an exception for three Section 936 intangibles, going concern value, goodwill, and marketing intangibles. That right there proves our point. If these items were not already considered to be intangibles, there would be no reason for an exception, which Treasury, in fact, did create for those for a period of time. It was eliminated in 2016 because of taxpayer abuse. This is the background. It had always been understood the definition of intangibles to be broad until 1991 when the Merck decision came out. And this is something that's mentioned in the preamble. I believe it's the 1992 proposed regs. Merck threw a monkey wrench in and looked at the definition of intangibles in the 1968 regulations and said it only includes specifically listed items and items that are normally thought of as an intellectual property that are enforceable property rights. This was narrowing Treasury's interpretation. And in light of that, Treasury queried in the 1993 proposed regs, should we include, expand the definition to include items not normally thought of as intellectual property? And there's two ways you could have done that. You could have added items to the list or you could expand the definition of Treasury did. And it's a good thing that Treasury did it that way, is if you add to the list, taxpayers are always trying to narrow Treasury's regulations. So if they had added goodwill, going concern, workforce in place, we'd still be here today because there would be an argument, oh, but it doesn't say growth options. Well, they wouldn't have as good an argument, though. They wouldn't, but... I mean, of course, I'm not disputing that people will always argue regardless of how popular you are. But they wouldn't have as, but I don't think they would have had as good an argument. And I think if it had been there, I'm not sure that Amazon would have won in the tax court. Hopefully not. No. But the point is, is that this was a better way to approach the problem when clarifying. Just so that I can narrow, are you still claiming our deference? That is a backup argument that we've made. I don't think the court needs to get there. What we're relying on is the plain language of the regulations itself and the regulatory purpose. And importantly, this court is told... But isn't your, our deference, isn't your, the our deference you're asking for based on conduct, the things that happened after this litigation? And that seems a pretty big stretch. Well, we're just saying if the court thinks it's unclear whether similar items were just defined... I think it's unclear. And I'm not, and I'm not clear how the taxpayer was on notice. The taxpayer is on notice by the breadth, first and foremost, by the breadth of the definition itself. Similar item is defined to include anything, anything other than a physical attribute. It's not... I'm looking at the reg. Substantial value independent of the services of any individual. I keep coming back to that. Independent of the services of any individual. That's correct. The value needs to be independent, but the intangible itself doesn't need to be independent of services because there's listed intangibles that are related to and dependent on services, for example, know-how. And the reason for this, and this is something that... Know-how isn't, is independent of the services of any individual? No, it's dependent on services. So it's the purpose of the regulation defining intangible in terms of physical property, tangible property and services is not to exclude any particular type of intangible. It's to make sure that there's not any double counting. I mean, the background principle of 42 and the regulations is that anything of value that is transferred and made available needs to be compensated. Nothing gets transferred for free. But you do want to make sure that there's not double counting. And the mechanism of the DCF, the discounted cash flow method, which was applied here, ensures that that does not happen. Amazon has noted that it's projected to make large intangible development costs into the future and that part of those costs are going to pay for the salaries of the research team. And that is the value of the services. But that has been excluded from the discounted cash flow analysis because it's subtracted out. So the only thing that's remaining is the greater intangible value of the workforce and the corporate culture. And that's what the tax court allowed Amazon Lux to access for free. And that's why we have a problem. There's new legislation, though, now, right? There is, yes. Congress has now codified our interpretation of the meaning of similar items. But they didn't say it was clarifying, did they? In the joint committee's report, when it was analyzed... No, but we go, but let's just assume that, what does it say in the plain language of what they wrote, that this is clarifying, which has always been true? It did not use the word clarifying in the statutory language itself. In the conference report, Congress did say this is not changing the existing transfer pricing rules. Did it say that this was, does the legislation say it specifically in response to Amazon? Yeah, I mean, not the legislation, but the legislative history does. It drops a footnote citing the Amazon case as well as the Veritas case. And again, I mean... So why, I'm anticipating their argument, and they're saying, well, then this is what they decided they want to make the law different. They didn't say the law was always what you're saying it is now. They're saying... That can be a factor that a statute is, in fact, clarifying, not changing. Again, you need to look back at the history. And if you look at the history of 367, if you look at the history of when Section 482 was... I'm not 42, I'm sorry. In 1982, when Congress enacted the definition of intangibles in 936, it said... So how does it work in terms of, okay, it's in response to Amazon and Veritas, but the all... But what they've done up to this point has already occurred with those companies. So do they always continue to operate under what the past law was? Because it's clarifying, it's only... It's adopting what had been the past law, which is Treasury's interpretation. Well, you're arguing because it's clarifying, but it doesn't say in there that it's clarifying, right? It doesn't say that it's in there, but it also says no inference should be drawn with regard to Treasury's ability to apply this law by regulations prior to the date of the legislation. And when Congress enacted the definition of intangible in 936, in 1982, it noted the definition is very broad. Nothing was excluded, and that legislative history cited Revenue Procedure 6310, which, as I had noted earlier, had said, goodwill is an intangible that's covered because it's not just items that are... Well, let me ask you this then. All right. So if... There were a lot of amici in this, and so I suspect that there's other people out there that... I mean, Amazon happens to have the firepower to go... I mean, to go up against the government. There's a lot of people that maybe don't have that same economic ability to do that. But if... And I'm saying this hypothetically. If we were to agree that the tax court got it right, then are there other people... I mean, does that mean you can't go out... You can't go after other people out there that did the same thing that Amazon did during that period of time? If you affirm the tax court? Yes. I mean, not under the 1994-95 regs, and in addition, tax... All right, but I'm just... I'm trying to... This is... I'm trying to... I'm... They're not going to want me to do that, and I'm not saying that... I'm not saying that. No. But I'm hypothetically trying to understand the consequences as people go forward. So if we don't affirm the tax court, then Amazon loses, and then I'm assuming there's a lot of other people out there that you would go after under the same period that you went after Amazon, right? Correct. If Amazon wins, is the consequence of that that those people in that window prior to the new legislation, they're alley, alley, oxen free? Well, I mean, that is a definite possibility, and the problem is if you affirm, this is terrible precedent to have on the books that assets of value can be transferred for free. That's completely inconsistent with the entire purpose for 482, because... Well, I know that that's your view, but I'm just trying to, in my mind, I always like to understand if I write an opinion or I sign on to opinion, how does that work in the real world? How do parties behave relative to that? Because I think we don't really want... I don't like unintended consequences. When I decide something, I'm going to decide it according to the law, but I like to understand the consequences. To reverse what the tax court did, the rewriting of section for the definition of intangible, the rewriting of the realistic alternatives principle, would just set the rules back to what Congress in its recent codification says are the current transfer pricing rules, which is that intangibles is broadly defined to include the items that were included in DCF. In this case, that the court determined were not compensable. It would be to allow the commissioner to use the realistic alternative principle, which is central to the arm's length standard, which is the concept that a party dealing arm's length is not going to accept a price that's less than one of its realistic alternatives. And that can be applied. And that's one of the problems in this case, is the court just ignored the language of the regs and rewrote them. And so one of the rewriting with the realistic alternatives principle is the tax court said, well, you only apply that if the transaction lacks economic substance. You can't restructure a transaction that has economic substance. And the realistic alternatives principle doesn't restructure the transaction. I have a question about cost sharing. The cost sharing regulations seem to refer to intangibles as assets that result from R&D efforts. Do items like goodwill, going, going concern value, and other residual business assets result from R&D efforts? They contributed to the development of R&D efforts, which is But I guess my question is, do they result from R&D efforts? I'm trying to understand your interpretation here. Well, what they had to pay for under the cost sharing for the buy-in is the use of preexisting intangibles for purposes of R&D. And Amazon, in developing new intangibles, would rely on its corporate culture of innovation. That was the really key intangible that was being used to develop its new intangibles. Remember, Amazon U.S. is doing all the intangible development. Amazon Lux is just contributing part of the cost. But your theory, I'm troubled, and I want to hear your response to Amazon's argument that your theory presupposes perpetual useful life. No. Well, for certain of the intangibles in the bundle, there is an indefinite useful life. There's, I think it's not in dispute that the corporate culture will last as long as the corporation is there, the know-how. The limited useful life was determined by the tax court to apply to the website, technological intangibles. And that's true. That had a limited life of 10 1⁄2 years for usefulness for further R&D. But the know-how and the innovative culture that made with that original technology and subsequent technology, that had an indefinite useful life. But I will make this point. Frisch's cash flows, his analysis projected 20 years plus a terminal value, which is common. Cornell admitted that that's what's commonly done when you have a bundle of intangibles that has something that will last for a long time. But it wasn't dependent on the terminal value. The court itself determined that marketing intangibles were very valuable for 20 years. The court could have, rather than throw the DCF out altogether, limited the cash flows to 20 years. The terminal value is really a small amount. And we're not asking this court to apply the DCF or to determine the value itself, but just to allow the commissioner to use the DCF. It's a very valuable tool. It's commonly used by economists and businesses, including Amazon. And in fact, Amazon's own expert, Cornell, acknowledged that that's the way he would approach the problem if all the intangibles had been compensable, that he would have done a DCF analysis just had Frisch had done. But anyway, we are not asking you to do it. We're asking you to remain so that the tax court could apply it and the parties can make further adjustments to the DCF. I'd like to reserve my time. Why don't we hear from the other side, and then you've saved some time. Okay. Good morning, Your Honors, and may it please the Court. My name is Carter Phillips, and I represent Amazon. Good morning. It seems to me that the argument of the government really comes down to a pretty simple proposition. It says that other similar items, meaning those that derive their value not from the physical attributes, but from intellectual content or other intangible properties, has to be read completely in the abstract without regard to the history or to anything in the context of this case, and that if you just read those words, you could envision a circumstance in which those words could be applied to going concern value and other elements of intangible And we've known this since that 1963 revenue ruling, and every statement by the IRS and every statement by Congress up until about 2009 and 2017 is a recognition that there is a fundamental difference between the kinds of intangibles that are listed in the 28 listed in the regulation and all of the residual intangibles. And the fundamental difference between them is that the specific intangibles, the ones that can be independently transferred, are all generated as a consequence of expenditures for which the taxpayer received a deduction. And so when you then begin to offload those, and that's when you're making income, if you can push the income out, at that point you end up with a serious tax evasion. But with the residual goodwill, one, you can't transfer that unless you're going to transfer the entire business, and second of all, and Congress has always recognized this, goodwill, going concern, all of those values are the product of income, a product of successful operations, of the genius of the individuals. And it's that fundamentally different element that has always caused, in the past, both the entire business community, Congress, and the IRS, to recognize that there's a fundamental divide there. Now, you can, as Congress did in 2017, make a fundamental change and say, look, we're going to change the very definition of similar, because we couldn't use the old definition, because that just talked about independent of, and now we've got to move it and change the causation to attribute, and then we're going to specifically identify goodwill, going concern, et cetera. And what does that tell you? That tells you that this didn't exist. Well, that was the clarification argument that I, the IRS is obviously, or the Commissioner is arguing that it was a clarification. You're arguing that it wasn't, that it's new law? And how do, tell me what are the best indicators to look at for that? I mean, I think the best indicator is the conference report that itself specifically calls it a revision of the definition, and specifically, it's interesting in the legislative changes that they made in 2017, when they're talking about methods evaluation, they talked about that, it specifically used the term clarification, but when they're talking about the definition of intangibles, they describe it as a revision of the definition. That's the, to me, that's the strongest indication of it. But second, candidly, all you have to do is read the language. I mean, nobody could, against this history, no one could realistically think that adding goodwill, going concern, value, workplace, and force isn't a vast shift in what you're going to consider as part of this undertaking. And it's important to put it in context. This was as part of an enormous restructuring of the tax code, and a revision of the relationships of multinationals in general. And as a consequence of that, it's not nearly as startling to think we're going to make a fundamental shift in 2017, but the idea that that remotely suggests that this existed in 1994 is, to my mind, a bridge too far. Well, I asked about what the consequences are, hypothetically, if either side wins or loses. So if we were to affirm the tax court, what does that mean about other people during that period of time? Other businesses during that period of time? I mean, it's important to recognize that the law changes. I mean, obviously, you want to win for Amazon. That's who you represent. That's pretty much my number one mission here. Yeah, exactly. But that being aside, we have amici and all of that. I mean, what we do know is that the entire business community relied upon the understanding that those intangibles weren't included and therefore structured their joint R&D projects across the pond in both directions with the expectation that it was just the 28 designated intangibles that were in play. Now, how many of those cases are still going on from that period of time up until 2009? Remember, 2009, the IRS adopted the platform change and said, look, we're no longer going to be bound by the 28. And so from that point on, there would have been changes and I suspect probably shifts in terms of who's going to make what kinds of decisions. The arguments of fair notice would be different. Yes. At that point, you at least have noticed that some elements under this platform theory are no longer going to be regarded as limited to the 28 specified intangibles. Well, my understanding is the tax court did not agree with you 100 percent in terms of your valuation. They took your method of valuation, but they changed the numbers and you're not appealing that. Right. And that's worth putting and keeping in mind just in terms of evaluating this, because there's this whole sense that somehow we're getting something for nothing out of all of this or that they got something for nothing. But the truth is we are paying more, we paid, we received more than $800 million for pretty much static intangibles with a limited shelf life. We have received billions of dollars since the cost-sharing agreement, and the government's experts said tens of billions of dollars will in fact be paid to Amazon as a consequence of this. And so what are we talking about? We're talking about $800 million for a business in 2005 that had been around for 10 years, had begun to do its significant work in the intangible space, but then ended up having to, as the trial judge found in a comprehensive opinion, Judge Lauber did an extraordinary job here, he specifically found that by 2012, almost all of this intangible effort is going to be dissipated. And yet 58 percent of the value of Frisch's discounted cash flow method arises after all of that's gone. And the reality is that at the end of the day, the reason this works is because we have a joint program, we're going to own it jointly, we're going to work, you know, most of the work obviously being done in the United States on the R&D side, but done in a way that's formulaic, that doesn't end up requiring additional fights day in and day out between the IRS and Amazon. We have a safe harbor going forward in terms of how all of that works. That is precisely what the cost-sharing arrangement, when it's done correctly, should lead to in terms of the overall outcome in this particular case. Can you go back and explain your expert's, I think, clarification? The opposing party cites many times Amazon's expert's statement that value would be paid in an arm's length transaction for this type of an asset, and then I think he came back and testified to clarify the difference between buying the entire company versus just buying in as a partner. Right, and what Professor Cornell explained was that, and actually it's, well, and it's also stated really nicely in the professor's amicus brief, because what they basically say is that if you look at residual business assets, right, they derive their value from the tangible and intangible assets and services of employees that make up a business, and so they're utterly inseparable from the entire enterprise. And that's what Cornell was saying is, yeah, there are times when if you sell your business, you obviously end up conveying the going concern and the other larger intangibles, but then nobody sits down and tries to do that independent of the sale of a business. Why not? Largely because it's almost impossible to figure out what the values of those things are. It's incredibly subjective. Indeed, it's an interesting point. But subjective anyway, though. It's subjective if you're buying Amazon or if you're buying in as a partner. So what's the real distinction there? Well, it's one thing to try to figure out what you think the total cash is going to be for an entire enterprise, trying to allocate what you think the cash is going to be to some subset of the assets within the enterprise and how that operates is a remarkably complicated process. And what's interesting about it is when the IRS in 1993 issued the preamble and requested comments on whether or not they should take on this new task. Let's go look at those. Expand. I'm sorry? The comment, should we expand to include. Should we expand to include? What did they get back in response? One was a question as to whether the statute allowed them to expand it that way. Two was a question as to whether or not it was consistent with the international treaty obligations of the United States. And three was that it would be absolutely impossible and unworkable to do. And in the face of those comments, what did the IRS do? It adopted this very strange language that I quoted to you at the very beginning that tells you essentially nothing. And what's missing, right? What is the bark that you would have expected from the dog under these circumstances, which is the explanation for, you know, we did this, and we did this because notwithstanding the comments that were made, we believe this, that, and the next thing, and that as a consequence of that, this is the way we're going to change this. They didn't do any of that. Having asked for comments about whether they should expand the definition, they came back with a change that was designed to, quote, clarify the definition. And I submit to you that what we have here is an extreme case of regulators' remorse. In 2017, it changed, right? In 2017, it changed. And going forward, it will be a brave new world. How much transfer pricing will go on and how it will be done, who knows? But, again, you've got to do it against the backdrop of an entire array of tax reforms. No, I appreciate that. And I think that the history here, the legislative history is compelling. It's just that when I looked at this particular part of your expert's theory in response, I think, to ‑‑ It was cross-examination, Maura. Yeah, I was going to say it wasn't your expert's theory, but the cross-examination, it did seem to beg the question, if it's so impossible, we do have the 2017 change. But, again, what I said is the question is, at the time, with the tools you had and what you were taking into account under the circumstances, what would you do? The business community said this is going to be really, really hard to do. Well, but not impossible. And the IRS took a pass. Right, but not impossible. And it seems to me your primary argument is that they didn't do it. That is, yes. I mean, if you're asking for the easiest, simplest way to decide this case, Your Honor, it's simply to say that in 1994, they did not take the action that they asked. They did not respond to the request to expand by, in fact, expanding. Never took any action along those lines. We undertook this deal in good faith based on the regulations as they existed at the time. And, frankly, the program has worked exactly the way you would want it to. We, in fact, received a very significant amount of money for what I think are limited value intangibles that were transferred, and the going forward program has worked exactly the way it should have. I'd like to ask you a question about when a statute regulation has a specific items followed by a phrase like and other similar items. The canon, I think, that you invoke is the ad justem generis or whatever, which everyone wants to invoke at some point, but would usually be appropriate. But the regulation here defines what it means to be similar in a certain way, and they say if it derives its value not from its physical attributes, but from its intellectual content or other intangible properties. Do the items the commissioner refers to as residual business assets meet that definition? I don't think so, actually, because in some ways it kind of depends on which ones you're talking about. So if you're talking about the culture and the, you know, I don't know how, and the growth opportunities, those are all driven exclusively by the enthusiasm and energy of the individuals. And so I would say no. So if the catch-all provision is reasonably susceptible to an interpretation that would embrace residual business assets, why shouldn't the commissioner's interpretation be given deference? Because the problem with that analysis is that you would just be taking the language on its own and not looking at anything else to see what the context is. And the reality is it's a very strange notion that you would adopt 28 items of intangibles, each of which is, in fact, independently transferable, largely intellectual property, add what you describe as a similar catch-all language, which is largely amorphous and somewhat difficult to understand, and say what that's designed to do is to capture a set of intangibles that you had an enormous debate about and have been discussing for decades and say we didn't do it. But is residual business assets, are residual business assets commercially transferable property? Is your answer is they are, but it's really hard? But they weren't included before? Well, I think they clearly weren't included before, and they now clearly are under 2017. Part of the reason I think they weren't included before was because they would be difficult to do. But I also think it's a fundamentally different point I made earlier, which is what the statute is designed to deal with is businesses who accept deductions, create these intangibles that are transferable, then transfer them at the point when they become valuable. That's not something you can do with growing concern and growth options and those things. First of all, they are all part of the tangible, intangible, and the individuals. They are the essence of the business, and at least as it existed in 2005 when we did this deal, and based on 1994 regulation, it only happens in that one circumstance. I'm not sure in the end I will disagree with your position, but I do have to say that the Houston Generous argument here is somewhat peculiar because instead of simply saying, and similar items, they then give us a definition of what they mean by similar items, and that definition is really broad. If all I'm doing is looking at that language, if I'm a pure textualist, you lose. Well, if you were a pure textualist, though, you would still have to read the 27 that are in front of them and the words and similar items. Yeah, but then I'd read the definition of similarity, and they're picking out a different definition of similarity than the one you want. They don't say similarity because these are the product of investment and so on. They don't say that at all. I understand your definition of similarity, but that's a very tidy and good definition, but that's not the one the text gives me. But if they intended it to have the boundless meaning that you suggest, right, then you would almost certainly expect in the face of unanimous opposition of the business community, invite the comments, you get comments that oppose it, you say you can't do it, and then you come back and you use this language without saying anything? I have to say the only way I can get to where you want me to get is to do that. I can't do it based simply on the language. I don't disagree with that. I mean, I think you could go either way. I said that and I started to say that. The language itself is capacious. The question is could it possibly have been intended in that way, and could any reasonable taxpayer have understood it as having that meaning in the face of a history that says there's an 800-pound gorilla and it's hiding in a mouse hole? I don't think so, Your Honor. That's not how the government works, and it's not the way the government should work. How the government does work and how the government should work are two very different questions. I'll stipulate, Your Honor. If there are no further questions, I'd urge the Court to affirm. Okay, thank you. Thank you. A few quick points. Number one, we're not asking this Court to read similar items in the abstract. We're asking this Court to follow the plain meaning and language of other similar items as well as looking at the history. And the history includes the very same day that this regulation was promulgated. A penalties provision was promulgated. addressing what are intangibles for purpose of the substantial understatement penalty as applied in the 482 context. And that penalty provision expressly defined intangibles as including goodwill. And that's consistent with Congress's understanding when it amended Section 367 in 1984 that intangibles included goodwill going concern value. It's consistent with the 1986 exception that Treasury enacted in response to the legislative history of 367, setting out the rule for intangibles and setting out exception to that rule for three certain intangibles, foreign goodwill, foreign going concern, and then certain marketing intangibles utilized by the foreign branch, the use of corporate name. So this was understood. I mean, taxpayers are always trying to push back. Taxpayers are still claiming that cost sharing is a safe harbor. All you have to do is share costs. That's completely inconsistent with what Congress wanted in 1986. It's completely inconsistent with what Treasury did in 1994, saying that to be respected for tax purposes, a cost-sharing arrangement has to have a buy-in that compensates for all preexisting intangibles made available. Any discussion about how it might be hard to value this intangible versus that intangible, I grant you, valuation cases can be difficult. That's the beauty of the DCF valuation method, is it values the preexisting intangibles as a bundle by backing into it, by calculating all the contributions to value and subtracting everything, and then that remaining value covers everything. You don't have to say this much for systems, this much for process, this much for know-how. That's why we're desperately fighting to be allowed to use that method, because it's very effective. Well, it also, though, but the change using that method and the changed legislation will give the Treasury's going to get a lot more money, right? Going forward, but there's open tax shares under the 1994 and 1995 regs. With regard to the 2009 and 2011 regulations, which were designed to correct the problem existing in this case by cutting off any debate over what the definition of intangibles is, that no matter what you call it, if it's provided in a cost-sharing arrangement, you're going to have to pay for it. Treasury is being faced by taxpayers citing the Amazon decision saying, no, we can transfer items for free. No, you can't apply the realistic alternatives principle, even though it's right there in the 2009 regs, just as it was right here in the 1994 regs. So I'm not sure that these more recent measures are going to solve the problem. We ask this Court to please remand the case so that the DCF method can be applied so that no valuable intangibles can be transferred for free. Okay, thank you very much. Thank both sides for very good arguments. Amazon.com versus Commissioner are now submitted for decision, and we're now in adjournment. Thank you.
judges: W. Fletcher, Callahan, Christen